[Nos. G022147, G022157. Fourth Dist., Div. Three. Mar. 10, 1998.]

In re the Marriage of JOHN A. and LUANNE H. BUZZANCA.
JOHN A. BUZZANCA, Respondent, v.
LUANNE H. BUZZANCA, Appellant.

**COUNSEL**

Van Deusen, Youmans & Walmsley and Robert R. Walmsley for Appellant.

Taylor Flynn and Mark Rosenbaum as Amici Curiae on behalf of Appellant and Minor.

Schwamb & Stabile, Thomas P. Stabile and Mark A. Hewitt for Respondent.

Jeffrey W. Doeringer, under appointment by the Court of Appeal, for Minor.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Carol Ann White and Mary A. Roth, Deputy Attorneys General, and Leslie Ellen Shear as Amici Curiae on behalf of Minor.

## OPINION

### SILLS, P. J.—

#### INTRODUCTION

Jaycee was born because Luanne and John Buzzanca agreed to have an embryo genetically unrelated to either of them implanted in a woman—a surrogate—who would carry and give birth to the child for them. After the fertilization, implantation and pregnancy, Luanne and John split up, and the question of who are Jaycee's lawful parents came before the trial court.

Luanne claimed that she and her erstwhile husband were the lawful parents, but John disclaimed any responsibility, financial or otherwise. The woman who gave birth also appeared in the case to make it clear that she made no claim to the child.

The trial court then reached an extraordinary conclusion: Jaycee had *no* lawful parents. First, the woman who gave birth to Jaycee was not the mother; the court had—astonishingly—already accepted a stipulation that neither she nor her husband were the "biological" parents. Second, Luanne was not the mother. According to the trial court, she could not be the mother because she had neither contributed the egg nor given birth. And John could not be the father, because, not having contributed the sperm, he had no biological relationship with the child.

We disagree. Let us get right to the point: Jaycee never would have been born had not Luanne and John both agreed to have a fertilized egg implanted in a surrogate.

The trial judge erred because he assumed that legal motherhood, under the relevant California statutes, could *only* be established in one of two ways, either by giving birth or by contributing an egg. He failed to consider the substantial and well-settled body of law holding that there are times when *fatherhood* can be established by conduct apart from giving birth or being genetically related to a child. The typical example is when an infertile husband consents to allowing his wife to be artificially inseminated. As our Supreme Court noted in such a situation over 30 years ago, the husband is the "lawful father" because he *consented* to the procreation of the child. (See *People* v. *Sorensen* (1968) 68 Cal.2d 280, 284-286 [66 Cal.Rptr. 7, 437 P.2d 495, 25 A.L.R.3d 1093].)

The same rule which makes a husband the lawful father of a child born because of his consent to artificial insemination should be applied here—by

the same parity of reasoning that guided our Supreme Court in the first surrogacy case, *Johnson* v. *Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776]—to both husband and wife. Just as a husband is deemed to be the lawful father of a child unrelated to him when his wife gives birth after artificial insemination, so should a husband *and* wife be deemed the lawful parents of a child after a surrogate bears a biologically unrelated child on their behalf. In each instance, a child is procreated because a medical procedure was initiated and consented to by intended parents. The only difference is that in this case—unlike artificial insemination—there is no reason to distinguish between husband and wife. We therefore must reverse the trial court's judgment and direct that a new judgment be entered, declaring that both Luanne and John are the lawful parents of Jaycee.[1]

## CASE HISTORY

John filed his petition for dissolution of marriage on March 30, 1995, alleging there were no children of the marriage. Luanne filed her response on April 20, alleging that the parties were expecting a child by way of surrogate contract. Jaycee was born six days later. In September 1996 Luanne filed a separate petition to establish herself as Jaycee's mother. Her action was consolidated into the dissolution case. In February 1997, the court accepted a stipulation that the woman who agreed to carry the child, and her husband, were not the "biological parents" of the child.[2] At a hearing held in March, based entirely on oral argument and offers of proof, the trial court determined that Luanne was not the lawful mother of the child and therefore John could not be the lawful father or owe any support.

The trial judge said: "So I think what evidence there is, is stipulated to. And I don't think there would be any more. One, there's no genetic tie between Luanne and the child. Two, she is not the gestational mother. Three,

---

[1]Technically, artificial insemination is classed as one of two kinds, (1) with or (2) without using the husband's semen, known respectively as homologous artificial insemination and heterologous artificial insemination. (See *People* v. *Sorensen, supra*, 68 Cal.2d at p. 284, fn. 2.) When we refer to artificial insemination in this opinion we are only referring to the heterologous variety.

[2]John's attorney was present at the hearing when the court accepted the stipulation that the surrogate was not the "biological" parent of Jaycee. He made no objection. Yet in the respondent's brief on appeal and in oral argument, he has argued that the surrogate is the lawful mother of Jaycee by virtue of the biological connection of having given birth.

One reaction to this inconsistency might be to hold, simply, that John is barred from arguing the point that the surrogate is the lawful mother because he did not object to the surrogate being let off the hook when he had the chance at the trial level. We reject that course of analysis because in this case of first impression it would be an intellectual cheat. Particularly in matters regarding children and parental responsibilities, courts must be wary of allowing lawyers from trying to cleverly (or inadvertently) maneuver a case into a posture where the court's decision does not reflect the underlying legal reality.

she has not adopted the child. That, folks, to me, respectfully, is clear and convincing evidence that she's not the legal mother."

After another hearing on May 7, regarding attorney fees, a judgment on reserved issues in the dissolution was filed, terminating John's obligation to pay child support, declaring that Luanne was not the legal mother of Jaycee, and declining "to apply any estoppel proposition to the issue of John's responsibility for child support." Luanne then filed a petition for a writ of supersedeas to stay the judgment; she also filed an appeal from it. This court then granted a stay which had the effect of keeping the support order alive for Jaycee. We also consolidated the writ proceeding with the appeal.

In his respondent's brief in this appeal, John tries to intimate—though he stops short of actually saying it—that Jaycee was not born as a result of a surrogacy agreement with his ex-wife. He points to the fact that the actual written surrogacy agreement was signed on August 25, 1994, but the implantation took place a little less than two weeks before, on August 13, 1994. The brief states: "At the time that the implantation took place, no surrogacy contract had been executed by the parties to this action."

Concerned with the implication made in John's respondent's brief, members of this court questioned John's attorney at oral argument about it. It turned out that the intimation in John's brief was a red herring, based merely on the fact that John did not sign a *written* contract until after implantation. Jaycee was nonetheless born as a result of a surrogacy agreement on the part of both Luanne *and* John; it was just that the agreement was an *oral* one prior to implantation. The written surrogacy agreement, John's attorney acknowledged in open court, was the written memorialization of that oral contract.

Members of this panel also pressed John's attorney to state whatever factually based defenses John might have offered if the case had actually been tried. John's attorney had not specifically stated such defenses at the hearing in March 1996; he had only vaguely indicated that "the facts as testified to would be somewhat different than" those which the trial court had "assumed."

Again, there was less than was intimated. John's signature on the written surrogacy agreement was not forged, or anything of the sort. His one trump card, finessed out only after repeated questioning and the importuning of one of our panel to articulate his "best facts," was this: John would offer testimony to the effect that Luanne told him that she would assume all responsibility for the care of any child born. Luanne alone would assume "the burdens of childrearing."

Therefore, even though there was no actual trial in front of the trial court on the matter, this appellate court will assume arguendo that if there had been a trial the judge would have believed John's evidence on the point and concluded that Luanne had indeed promised not to hold John responsible for the child contemplated by their oral surrogacy agreement.

## DISCUSSION

### *The Statute Governing Artificial Insemination Which Makes a Husband the Lawful Father of a Child Unrelated to Him Applies to Both Intended Parents in This Case*

■ Perhaps recognizing the inherent lack of appeal for any result which makes Jaycee a legal orphan, John now contends that the surrogate is Jaycee's legal mother; and further, by virtue of that fact, the surrogate's husband is the legal father. His reasoning goes like this: Under the Uniform Parentage Act (the Act), and particularly as set forth in section 7610 of Family Code, there are only two ways by which a woman can establish legal motherhood, i.e., giving birth or contributing genetically.[3] Because the genetic contributors are not known to the court, the only candidate left is the surrogate who must therefore be deemed the lawful mother. And, as John's counsel commented at oral argument, if the surrogate and her husband cannot support Jaycee, the burden should fall on the taxpayers.

The law doesn't say what John says it says. It doesn't say: "The legal relationship between mother and child shall be established only by either proof of her giving birth or by genetics." The statute says "may," not "shall," and "under this part," *not* "by genetics." Here is the complete text of Family Code section 7610: "The parent and child relationship may be established as follows: [¶] (a) Between a child and the natural mother, it may be established by proof of her having given birth to the child, or under this part. [¶] (b) Between a child and the natural father, it may be established under this part. [¶] (c) Between a child and an adoptive parent, it may be established by proof of adoption."

The statute thus contains no direct reference to genetics (i.e., blood tests) at all. The *Johnson* decision teaches us that genetics is simply *subsumed* in the words "under this part." In that case, the court held that genetic consanguinity was equally "acceptable" as "proof of maternity" as evidence of giving birth. (*Johnson* v. *Calvert, supra,* 5 Cal.4th at p. 93.)

It is important to realize, however, that in construing the words "under this part" to include genetic testing, the high court in *Johnson* relied on several

---

[3]The Act can be found in 9B West's Uniform Laws Annotated (1987) Uniform Parentage Act (1973 act) page 287.

statutes in the Evidence Code (Evid. Code, former §§ 892, 895, & 895.5) all of which, by their terms, only applied to *paternity*. (See *Johnson* v. *Calvert, supra,* 5 Cal.4th at pp. 90-92.)[4] It was only by a "parity of reasoning" that our high court concluded those statutes which, on their face applied only to men, were also "dispositive of the question of maternity." (5 Cal.4th at p. 92.)

The point bears reiterating: It was only by a parity of reasoning from statutes which, on their face, referred only to *paternity* that the court in *Johnson* v. *Calvert* reached the result it did on the question of *maternity*. Had the *Johnson* court reasoned as John now urges us to reason—by narrowly confining the means under the Act by which a woman could establish that she was the lawful mother of a child to texts which on their face applied only to motherhood (as distinct from fatherhood)—the court would have reached the opposite result.[5]

---

[4]All three of the statutes were designed for proceedings involving disputed paternity. None mentioned maternity. Here is the relevant portion of each statute as it read in 1993 when *Johnson* was decided, all emphasis ours:

Evidence Code former section 892: "In a civil action *in which paternity is a relevant fact,* the court may . . . order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve *the question of paternity* against such party . . . . Any party's refusal . . . shall be admissible in evidence in any proceeding *to determine paternity.*" (Italics added.)

Evidence Code former section 895: "If the court finds that the conclusions of all the experts . . . are that the alleged father is not the father of the child, *the question of paternity* shall be resolved accordingly. If the experts disagree . . . or if the tests show the probability of *the alleged father's paternity,* the question . . . shall be submitted upon all the evidence, including evidence based upon the tests." (Italics added.)

Evidence Code former section 895.5: "(a) There is a rebuttable presumption, affecting the burden of proof, *of paternity,* if the court finds that the paternity index . . . is 100 or greater." (Italics added.)

With the introduction of the Family Code, Evidence Code former sections 892, 895, and 895.5 have become, respectively, Family Code sections 7551, 7554, and 7555. There is no material change in the language; the statutes still refer only to paternity.

[5]In *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1224-1226 [30 Cal.Rptr.2d 893], the court refused to apply certain *presumptions* regarding paternity found in the Act to overcome the claim of a woman who was both the genetic and birth mother. Relying on *In re Zacharia D.* (1993) 6 Cal.4th 435 [24 Cal.Rptr.2d 751, 862 P.2d 751], we observed that there may be times when the Act cannot be applied in a gender interchangeable manner. (See *In re Moschetta, supra,* 25 Cal.App.4th at p. 1225, fn. 8.)

It made sense in *Moschetta* not to apply the paternity statutes cited by the father to the biologically unrelated intended mother because those statutes merely embody presumptions. The statutes were: (1) the presumption that a child of a wife cohabiting with her husband at the time of birth is conclusively presumed to be a child of the marriage unless the husband is impotent or sterile (see Fam. Code, § 7540), and (2) the presumption that a man is the natural father if he receives the child into his home and openly holds out the child as his own (Fam. Code, § 7611, subd. (d)). We rejected application of these presumptions because, even assuming they could be applied to a woman, they were only presumptions and, just like a paternity case, could be overcome by blood tests showing an actual genetic relationship. (*In re*

In addition to blood tests there are several other ways the Act allows paternity to be established. Those ways are not necessarily related at all to any biological tie. Thus, under the Act, paternity may be established by:

—marrying, remaining married to, or attempting to marry the child's mother when she gives birth (see Fam. Code, § 7611, subds. (a) & (b));

—marrying the child's mother after the child's birth and either consenting to being named as the father on the birth certificate (Fam. Code, § 7611, subd. (c)(1)) or making a written promise to support the child (see Fam. Code, § 7611, subd. (c)(2)).

A man may also be deemed a father under the Act in the case of artificial insemination of his wife, as provided by section 7613 of the Family Code.[6] To track the words of the statute: "If, under the supervision of a licensed physician and surgeon and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived."[7]

As noted in *Johnson*, "courts must construe statutes in factual settings not contemplated by the enacting legislature." (*Johnson* v. *Calvert, supra, 5*

---

*Marriage of Moschetta, supra,* 25 Cal.App.4th at pp. 1225-1226.) Most fundamentally, as we pointed out on page 1226 of the opinion, the presumptions were inapposite because they arose out of the "old law of illegitimacy" and were designed as evidentiary devices to make a determination of a child's biological father.

*Moschetta* thus cannot be read for the proposition that statutes which are part of the Act and refer to an individual of one sex can never be applied to an individual of another. For one reason, *Moschetta* never said that. For another, such a broad proposition would contradict the rationale used by a higher court in *Johnson.*

[6]Family Code section 7613 is California's enactment of the artificial insemination provision of section 5 of the Act

[7]The entire statute reads as follows: "If, under the supervision of a licensed physician and surgeon and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician and surgeon shall certify their signatures and the date of the insemination, and retain the husband's consent as part of the medical record, where it shall be kept confidential and in a sealed file. However, the physician and surgeon's failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician and surgeon or elsewhere, are subject to inspection only upon an order of the court for good cause shown. [¶] (b) The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." (Fam. Code, § 7613.)

Family Code section 7613 varies from the promulgated version in that it omits the word "married" in subdivision (b) in front of the word "woman," a textual indication that the California Legislature contemplated use of artificial insemination by single women.

Cal.4th at p. 89.) So it is, of course, true that application of the artificial insemination statute to a gestational surrogacy case where the genetic donors are unknown to the court may not have been contemplated by the Legislature. Even so, the two kinds of artificial reproduction are *exactly* analogous in this crucial respect: Both contemplate the procreation of a child by the consent to a medical procedure of someone who intends to raise the child but who otherwise does not have any biological tie.

If a husband who consents to artificial insemination under Family Code section 7613 is "treated in law" as the father of the child by virtue of his consent, there is no reason the result should be any different in the case of a married couple who consent to in vitro fertilization by unknown donors and subsequent implantation into a woman who is, as a surrogate, willing to carry the embryo to term for them. The statute is, after all, the clearest expression of past legislative intent when the Legislature did contemplate a situation where a person who caused a child to come into being had no biological relationship to the child.

Indeed, the establishment of fatherhood and the consequent duty to support when a husband consents to the artificial insemination of his wife is one of the well-established rules in family law.[8] The leading case in the country (so described by a New York family court in *In re Adoption of Anonymous* (1973) 74 Misc.2d 99 [345 N.Y.S.2d 430, 433]) is *People* v. *Sorensen, supra,* 68 Cal.2d 280, in which our Supreme Court held that a man could even be *criminally* liable for failing to pay for the support of a child born to his wife during the marriage as a result of artificial insemination using sperm from an anonymous donor.

In *Sorensen,* the high court emphasized the role of the husband in *causing* the birth, even though he had no biological connection to the child: "[A] reasonable man who . . . actively participates and consents to his wife's artificial insemination in the hope that a child will be produced whom they will treat as their own, *knows that such behavior carries with it the legal responsibilities of fatherhood and criminal responsibility for nonsupport.*" (68 Cal.2d at p. 285, italics added.) The court went on to say that the husband was "directly responsible" for the "existence" of the child and repeated the point that "without defendant's active participation and consent the child would not have been procreated." (*Ibid.*)

*Sorensen* expresses a rule universally in tune with other jurisdictions. "Almost exclusively, courts which have addressed this issue have assigned

---

[8]The cases have been collected in the Annotation, Rights and Obligations Resulting From Human Artificial Insemination (1991) 83 A.L.R.4th 295.

parental responsibility to the husband based on conduct evidencing his consent to the artificial insemination." (*In re Baby Doe* (1987) 291 S.C. 389 [353 S.E.2d 877, 878]; accord, *Gursky* v. *Gursky* (1963) 39 Misc.2d 1083 [242 N.Y.S.2d 406, 411-412] [even though child was not technically "legitimate" under New York law at the time, husband's conduct in consenting to the artificial insemination properly invoked application of the doctrine of equitable estoppel requiring him to support the child]; *Anonymous* v. *Anonymous* (1964) 41 Misc.2d 886 [246 N.Y.S.2d 835, 836-837] [following *Gursky*]; *K.S.* v. *G.S.* (1981) 182 N.J. Super. 102 [440 A.2d 64, 68] [because husband did not offer clear and convincing evidence that he had *withdrawn* his consent to artificial insemination procedure, he was bound by initial consent given earlier and accordingly held to be lawful father of the child]; *In re Marriage of Adams* (1988) 174 Ill.App.3d 595 [124 Ill.Dec. 184, 528 N.E.2d 1075, 1087] [affirming child support award where trial court had determined there was "actual consent" to artificial insemination];[9] *K.B.* v. *N.B.* (Tex.Ct.App. 1991) 811 S.W.2d 634, 639] [even though husband did not consent in writing to insemination procedure, his full knowledge of the facts and willing participation in the artificial insemination, involvement in child birth classes, speaking of the child as "our baby" and passage of time before repudiation established that he ratified procedure and was therefore liable for child support]; *Levin* v. *Levin* (Ind. 1994) 645 N.E.2d 601, 605 [consent of husband to wife's artificial insemination meant obligation to support because child was a "child of the marriage," the same as if the child had been adopted during the marriage].)

One New York family court even went so far as to hold the lesbian partner of a woman who was artificially inseminated responsible for the support of two children where the partner had dressed as a man and the couple had obtained a marriage license and a wedding ceremony had been performed prior to the inseminations. (*Karin T.* v. *Michael T.* (1985) 127 Misc.2d 14 [484 N.Y.S.2d 780].)[10] Echoing the themes of causation and estoppel which underlie the cases, the court noted that the lesbian partner had "by her course of conduct in this case . . . brought into the world two innocent children" and should not "be allowed to benefit" from her acts to the detriment of the children and public generally. (484 N.Y.S.2d at p. 784.)[11]

Indeed, in the one case we are aware of where the court did not hold that the husband had a support obligation, the reason was *not* the absence of a

---

[9]*Adams* was later reversed on the procedural ground that Florida law, not Illinois law, governed the dispute and the case was remanded to the trial court for further proceedings in light of that. (See *In re Marriage of Adams* (1990) 133 Ill.2d 437 [141 Ill.Dec. 448, 551 N.E.2d 635].)

[10]Michael T.'s name was originally Marlene. (*Karin T.* v. *Michael T., supra,* 484 N.Y.S.2d at p. 781.)

[11]In *Karin T.* v. *Michael T.,* the court held in a case involving child support that the lesbian partner was "indeed a 'parent' to whom such responsibility attaches." (484 N.Y.S.2d at p.

biological relationship as such, but because of actual lack of consent to the insemination procedure. (See *In re Marriage of Witbeck-Wildhagen* (1996) 281 Ill.App.3d 502 [217 Ill.Dec. 329, 667 N.E.2d 122, 125-126] [it would be "unjust" to impose support obligation on husband who never consented to the artificial insemination].)

It must also be noted that in applying the artificial insemination statute to a case where a party has caused a child to be brought into the world, the statutory policy is really echoing a more fundamental idea—a sort of *grundnorm* to borrow Hans Kelsen's famous jurisprudential word—already established in the case law. That idea is often summed up in the legal term "estoppel." Estoppel is an ungainly word from the Middle French (from the word meaning "bung" or "stopper") expressing the law's distaste for inconsistent actions and positions—like consenting to an act which brings a child into existence and then turning around and disclaiming any responsibility.

While the *Johnson* v. *Calvert* court was able to predicate its decision on the Act rather than making up the result out of whole cloth, it is also true that California courts, prior to the enactment of the Act, had based certain decisions establishing paternity merely on the common law doctrine of estoppel. We have already discussed one of those decisions, *People* v. *Sorensen*, in detail. There an ex-husband was held, in light of his role in causing the birth of the child, to be estopped from disclaiming responsibility. Common law estoppel was also the basis for establishing paternity and its concomitant responsibility as far back as the 1961 decision of *Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, 662 [11 Cal.Rptr. 707, 90 A.L.R.2d 569] (husband who took illegitimate child into his home and held child out

---

784.) By contrast, *Nancy S.* v. *Michele G.* (1991) 228 Cal.App.3d 831 [279 Cal.Rptr. 212] held that the lesbian partner of a woman who gave birth to two children through artificial insemination was not a parent *for purposes of custody and visitation*, even though the partner alleged that she "helped facilitate the conception and birth of both children." (*Id.* at p. 836.) The parties presented no issue of support obligation in *Nancy S.*, so while the court acknowledged the doctrine of estoppel in *that* context, it declined to extend the estoppel doctrine "for the purpose of awarding custody and visitation to a nonparent." (*Id.* at p. 839.)

Likewise, in *West* v. *Superior Court* (1997) 59 Cal.App.4th 302 [69 Cal.Rptr.2d 160], the court held that a former lesbian partner did not even have standing to obtain visitation rights. As in *Nancy S.* there was no issue of child support based on the partner's role in the conception and birth.

In the present case we are dealing with a man and woman who were married at the time of conception and signing of the surrogacy agreement, and we are reasoning from a statute, Family Code section 7613, which contemplates parenthood on the part of a married man without biological connection to the child borne by his wife. Whether section 7613 might be applied by a parity of reasoning, as we do today to a married couple, to a *non*married couple is not before us and we will not speculate as to the answer. It is enough to say that because the *Nancy S.* and *West* cases did not involve the issue of support and did involve *non*married couples at the time of the artificial insemination, they are distinguishable.

as his own "estopped" to assert illegitimacy and "avoid liability for its support").

There is no need in the present case to predicate our decision on common law estoppel alone, though the doctrine certainly applies. The estoppel concept, after all, is *already* inherent in the artificial insemination statute. In essence, Family Code section 7613 is nothing more than the codification of the common law rule articulated in *Sorensen*: By consenting to a medical procedure which results in the birth of a child—which the *Sorensen* court has held establishes parenthood by common law estoppel—a husband incurs the legal status and responsibility of fatherhood. (See *People* v. *Sorensen, supra,* 68 Cal.2d at p. 285.)

John argues that the artificial insemination statute should not be applied because, after all, his wife did not give birth. But for purposes of the statute with its core idea of estoppel, the fact that Luanne did not give birth is irrelevant. The statute contemplates the establishment of lawful fatherhood in a situation where an intended father has no biological relationship to a child who is procreated as a result of the father's (as well as the mother's) *consent* to a medical procedure.

### *Luanne is the Lawful Mother of Jaycee, Not the Surrogate, and Not the Unknown Donor of the Egg*

In the present case Luanne is situated like a husband in an artificial insemination case whose consent triggers a medical procedure which results in a pregnancy and eventual birth of a child. Her motherhood may therefore be established "under this part," by virtue of that consent. In light of our conclusion, John's argument that the surrogate should be declared the lawful mother disintegrates. The case is now postured like the *Johnson* v. *Calvert* case, where motherhood could have been "established" in either of two women under the Act, and the tie broken by noting the intent to parent as expressed in the surrogacy contract. (See *Johnson* v. *Calvert, supra,* 5 Cal.4th at p. 93.) The only difference is that this case is not even close as between Luanne and the surrogate. Not only was Luanne the clearly intended mother, no bona fide attempt has been made to establish the surrogate as the lawful mother.[12]

We should also add that neither could the woman whose egg was used in the fertilization or implantation make any claim to motherhood, even if she

---

[12]As noted in footnote 2, *ante*, John's attorney did nothing to object when the trial court accepted a stipulation taking the surrogate and her husband out of this case. Accordingly, nothing in this opinion is intended to address the question of who might be responsible for a . child when *only* the surrogate mother is available.

were to come forward at this late date. Again, as between two women who would both be able to establish motherhood under the Act, the *Johnson* decision would mandate that the tie be broken in favor of the intended parent, in this case, Luanne.

Our decision in *In re Marriage of Moschetta, supra,* 25 Cal.App.4th 1218, relied on by John, is inapposite and distinguishable. In *Moschetta,* this court held that a contract giving rise to a "traditional" surrogacy arrangement where a surrogate was simply inseminated with the husband's sperm could not be *enforced* against the surrogate by the intended father. (*Id.* at p. 1231.) In order for the surrogate not to be the lawful mother she would have to give the child up for adoption. (See *id.* at pp. 1231, 1233.) In *Moschetta,* the surrogate was the mother both by birth and genes; the woman contemplated as the intended mother in the surrogacy contract gave up any claim to the child. (*Id.* at pp. 1223-1225.) In fact, at the appellate level, she went so far as to file a brief in favor of the birth mother's claim. (See *id.* at p. 1224.)

*Moschetta* is inapposite because this court never had occasion to consider or discuss whether the original intended mother's participation in the surrogacy arrangement, which brought about the child's birth, might have formed the basis for holding her responsible as a parent. She had given up her claim; the issue was not before the court. Unlike the *Johnson* case there was no tie to break between two women both of whom could be held to be mothers under the Act. (See 25 Cal.App.4th at p. 1224. ["There is no 'tie' to break."].) When courts do not consider propositions, their subsequent decisions are not precedent for them. (E.g., *American Federation of Labor* v. *Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1039 [56 Cal.Rptr.2d 109, 920 P.2d 1314]; *Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].)

*Moschetta* is distinguishable because it involved the claim of a woman who both gave birth to the child, "contributed" the egg, and who wanted the child enough to go to court to seek custody. (See *In re Marriage of Moschetta, supra,* 25 Cal.App.4th at p. 1223.) The only alternative was a woman who did not give birth, did not contribute genes, and who gave up her claim. (*Id.* at pp. 1224-1225.) Only if the surrogacy contract 'were *specifically enforced* in *Moschetta* could this court have ruled in favor of the father's claim to *exclusive* parenthood.

There is a difference between a court's *enforcing* a surrogacy agreement and making a legal determination based on the intent *expressed in* a surrogacy agreement. (See 25 Cal.App.4th at pp. 1230, 1235, fn. 23.) By the same token, there is also an important distinction between enforcing a surrogacy

contract and making a legal determination based on the fact that the contract itself *sets in motion* a medical procedure which results in the birth of a child.

In the case before us, we are not concerned, as John would have us believe, with a question of the enforceability of the oral and written surrogacy contracts into which he entered with Luanne. This case is not about "transferring" parenthood pursuant to those agreements. We are, rather, concerned with the consequences of those agreements as *acts* which *caused the birth* of a child.

The legal paradigm adopted by the trial court, and now urged upon us by John, is one where all forms of artificial reproduction in which intended parents have no biological relationship with the child result in legal parentlessness. It means that, absent adoption, such children will be dependents of the state. One might describe this paradigm as the "adoption default" model: The idea is that by not specifically addressing some permutation of artificial reproduction, the Legislature has, in effect, set the default switch on adoption. The underlying theory seems to be that when intended parents resort to artificial reproduction without biological tie the Legislature wanted them to be *screened* first through the adoption system. (Thus John, in his brief, argues that a surrogacy contract must be "subject to state oversight.")

The "adoption default" model is, however, inconsistent with both statutory law and the Supreme Court's *Johnson* decision. As to the statutory law, the Legislature has already made it perfectly clear that public policy (and, we might add, common sense) favors, whenever possible, the establishment of legal parenthood with the concomitant responsibility. Family Code section 7570, subdivision (a) states that "There is a compelling state interest in establishing paternity for all children." The statute then goes on to elaborate why establishing paternity is a good thing: It means someone besides the taxpayers will be responsible for the child: "Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits . . . ." (*Ibid.*) In light of this strong public policy, the statutes which follow section 7570, subdivision (a) seek to provide a "simple system allowing for the establishment of voluntary paternity." (Fam. Code, § 7570, subd. (b).)

Family Code Section 7570 necessarily expresses a legislative policy applicable to maternity as well. It would be lunatic for the Legislature to declare that establishing paternity is a compelling state interest yet conclude that establishing maternity is not. The obvious reason the Legislature did not include an explicit parallel statement on "maternity" is that the issue almost never arises except for extraordinary cases involving artificial reproduction.

Very plainly, the Legislature has declared its preference for assigning *individual* responsibility for the care and maintenance of children; not leaving the task to the taxpayers. That is why it has gone to considerable lengths to ensure that parents will live up to their support obligations. (Cf. *Moss* v. *Superior Court* (1998) 17 Cal.4th 396, 424 [71 Cal.Rptr.2d 215, 950 P.2d 59] [noting legislative priority put on child support obligations].) The adoption default theory flies in the face of that legislative value judgment.

As this court noted in *Jaycee B.* v. *Superior Court* (1996) 42 Cal.App.4th 718, 731 [49 Cal.Rptr.2d 694], the *Johnson* court had occasion, albeit in dicta, to address "pretty much the exact situation before us." The language bears quoting again: "In what we must hope will be the extremely rare situation in which neither the gestator nor the woman who provided the ovum for fertilization is willing to assume custody of the child after birth, a rule recognizing the intending parents as the child's legal, natural parents should best promote certainty and stability . . . ." (*Johnson* v. *Calvert, supra,* 5 Cal.4th at pp. 94-95.) This language quite literally describes precisely the case before us now: neither the woman whose ovum was used nor the woman who gave birth have come forward to assume custody of the child after birth.

John now argues that the Supreme Court's statement should be applied only in situations, such as that in the *Johnson* case, where the intended parents have a genetic tie to the child. The context of the *Johnson* language, however, reveals a broader purpose, namely, to emphasize the intelligence and utility of a rule that looks to intentions.

The statement, quoted above, is at the bottom of 5 Cal.4th at page 94 and top of page 95 of the opinion. Contextually, however, it is part of the development of a series of ideas which begin on page 93. The *Johnson* court had just enunciated its conclusion that in cases of "genetic consanguinity" and "giving birth" the intended mother is to be held the lawful mother.[13] The court then found "support" for its conclusions in the writings of several legal commentators (*id.* at p. 93), the first of whom, Professor Hill, had made the point that the intended parents are the " 'first cause, or prime movers, of the procreative relationship.' " (*Id.* at p. 94, quoting Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology as the Basis for Parental Rights* (1991) 66 N.Y.U. L. Rev. 353, 415.) The court then quoted two more law review

---

[13]This rule, incidentally, has the salutary effect of working both ways. Thus if an intended mother who could carry a baby to term but had no suitable eggs was implanted with an embryo in which the egg was from a donor who did not intend to parent the child, the law would still reflect the intentions of the parties rather than some arbitrary or imposed preference.

articles, both of which emphasized the same theme as Professor Hill.[14] This laid the foundation for the court's next point, which was that people who " 'choose' " to bring a child into being are likely to have the child's best interest at heart,[15] which the court immediately juxtaposed against the surrogate's position which would result in a woman becoming the legal mother *against* her expectations. (*Johnson* v. *Calvert, supra,* 5 Cal.4th at p. 94.) Then came the sentence which we have already quoted addressing the "extremely rare situation" where—as is precisely the case before us now—neither the woman who has given birth nor the woman who provided the ovum were "willing to assume custody of the child after birth"—and therefore recognizing intentions as the best rule to promote certainty and stability for the child. (*Id.* at pp. 94-95.)

In context, then, the high court's considered dicta is directly applicable to the case at hand. The context was not limited to just *Johnson*-style contests between women who gave birth and women who contributed ova, but to any situation where a child would not have been born " 'but for the efforts of the intended parents.' " (5 Cal.4th at p. 94, quoting Hill, *op. cit., supra,* 66 N.Y.U. L.Rev. at p. 415.)

Finally, in addition to its contravention of statutorily enunciated public policy and the pronouncement of our high court in *Johnson,* the adoption default model ignores the role of our dependency statutes in protecting children. Parents are not screened for the procreation of their *own* children; they are screened for the adoption of *other* people's children. It is the role of the dependency laws to protect children from neglect and abuse from their own parents. The adoption default model is essentially an exercise in circular reasoning, because it assumes the idea that it seeks to prove; namely, that a child who is born as the result of artificial reproduction is somebody else's child from the beginning.

In the case before us, there is absolutely no dispute that Luanne caused Jaycee's conception and birth by initiating the surrogacy arrangement whereby an embryo was implanted into a woman who agreed to carry the

---

[14]The *Johnson* court quoted Professor Schulz to the effect that " 'intentions that are voluntarily chosen, deliberate, express and bargained-for ought presumptively to determine legal parenthood' " (*Johnson* v. *Calvert, supra,* 5 Cal.4th at p. 94, quoting Schultz, *Reproductive Technology and Intent-Based Parenthood: An Opportunity for Gender Neutrality* (1990) Wis. L.Rev. 297, 323) and a Yale Law Journal Note that the " '[m]ental concept of the child *is a controlling factor of its creation*' " (*Johnson* v. *Calvert, supra,* 5 Cal.4th at p. 94, quoting Note, *Redefining Mother: A Legal Matrix for New Reproductive Technologies* (1986) 96 Yale L.J. 187, 196 (italics added).)

[15]See *Johnson* v. *Calvert, supra,* 5 Cal.4th at page 94, quoting Schulz, *op. cit. supra,* Wis. L.Rev. at page 397.

baby to term on Luanne's behalf. In applying the artificial insemination statute to a gestational surrogacy case where the genetic donors are unknown, there is, as we have indicated above, no reason to distinguish *between* husbands and wives. Both are equally situated from the point of view of consenting to an act which brings a child into being.[16] Accordingly, Luanne should have been declared the lawful mother of Jaycee.

### *John Is the Lawful Father of Jaycee Even If Luanne Did Promise to Assume All Responsibility for Jaycee's Care*

The same reasons which impel us to conclude that Luanne is Jaycee's lawful mother also require that John be declared Jaycee's lawful father. Even if the written surrogacy contract had not yet been signed at the time of conception and implantation, those occurrences were nonetheless the direct result of actions taken pursuant to an oral agreement which envisioned that the fertilization, implantation and ensuing pregnancy would go forward. Thus, it is still accurate to say, as we did the first time this case came before us, that for all practical purposes John caused Jaycee's conception every bit as much as if things had been done the old-fashioned way. (*Jaycee B.* v. *Superior Court, supra,* 42 Cal.App.4th at p. 730.)

When pressed at oral argument to make an offer of proof as to the "best facts" which John might be able to show if this case were tried, John's attorney raised the point that Luanne had (allegedly, we must add) promised to assume all responsibility for the child and would not hold him responsible for the child's upbringing. However, even if this case were returned for a trial on this point (we assume that Luanne would dispute the allegation) it could make no difference as to John's lawful paternity. It is well established that parents cannot, by agreement, limit or abrogate a child's right to support.[17]

The rule is nicely illustrated by the case of *In re Marriage of Ayo* (1987) 190 Cal.App.3d 442 [235 Cal.Rptr. 458]. There, a husband adopted his

---

[16]Apropos our discussion in footnote 5, *ante,* it may be—though the question does not need to be decided now—that some of the other ways by which *paternity* may be shown under the Act in addition to genetics are not "interchangeable" between the sexes. (*In re Marriage of Moschetta, supra,* 25 Cal.App.4th at p. 1225.) The artificial insemination statute, however, most certainly is. Unlike *presumptions* used to establish paternity which have their root in the "old law of illegitimacy" (see *id.,* at p. 1226), the artificial insemination statute bears directly on a medical procedure which contemplates parenthood apart from any biological tie with the father.

[17]The legal consequences of John's allegation that Luanne would assume sole responsibility were briefed. Minor's appointed counsel specifically anticipated the point on page 11, footnote 11 of the minor's opening brief. Rather than attempt to show that Luanne's alleged promise *would* make a difference, John's respondent's brief merely alludes to a vague need to consider "[a]ll of the aspects of contract formation . . . including, but not limited to, the issues of mistake of law or fact, fraud, coercion and duress" and claims that John had been

wife's son from a previous marriage, then the couple were divorced. (*Id.* at p. 445.) A year after the dissolution, the son's natural father (despite the fact he had already been adopted) started visiting him. (*Ibid.*) In light of the natural father's renewed interest, and in settlement of some arrearages in the division of community property and child support by a lump sum payment, the parties entered into a written agreement in which the wife promised, as Luanne has allegedly promised in this case, to hold the husband "harmless from any claims of any kind regarding her minor child." (*Id.* at p. 448.) The agreement was filed as a written stipulation with the court and was even signed by the trial judge after the words, "it is so ordered." (*Id.* at p. 448.)

More than five years later the wife reneged on the agreement and sought to renew the husband's child support obligation. (190 Cal.App.3d at p. 445.) The appellate court held that the agreement was invalid, reasoning that the "rights of the contracting parties under agreements such as this one affecting children must yield to the welfare of the children." (*Id.* at p. 451.)

The rule against enforcing agreements obviating a parent's child support responsibilities is also illustrated by *Stephen K.* v. *Roni L.* (1980) 105 Cal.App.3d 640 [164 Cal.Rptr. 618, 31 A.L.R.4th 383], a case which is virtually on point about Luanne's alleged promise. In *Stephen K.*, a woman was alleged to have falsely told a man that she was taking birth control pills. In "reliance" upon that statement the man had sexual intercourse with her. (*Id.* at p. 642.) The woman became pregnant and brought a paternity action. While the man did not attempt to use the woman's false statement as grounds to avoid paternity, he did seek to achieve the same result by cross-complaining against the woman for damages based on her fraud.

The trial court dismissed the cross-complaint on demurrer and the appellate court affirmed. The cross-complaint was "nothing more than asking the court to supervise the promises made between two consenting adults as to the circumstances of their private sexual conduct." (105 Cal.App.3d at pp. 644-645.)

There is no meaningful difference between the rule articulated in *Stephen K.* and the situation here—indeed, the result applies a fortiori to the present

---

precluded from presenting evidence on these issues by the "preemptive ruling of the trial court." Three times now—when this case was here before (*Jaycee B.* v. *Superior Court, supra*, 42 Cal.App.4th 718), at the trial, and in his respondent's brief—John has had the opportunity to present offers of proof of facts to the court which would change the result which would otherwise flow from his oral and written consent to the surrogacy. Having chosen not to respond to a point made by minor's counsel in her opening brief, John cannot now be heard to complain that he didn't have the opportunity to brief it. Then again, to be fair, John's attorney may himself have recognized that Luanne's alleged promise was of no consequence and it would be almost frivolous to press the issue at the appellate level. Every family law attorney knows that courts will not enforce promises by one parent to hold the other parent harmless from any claims of child support.

case: If the man who engaged in an act which merely opened the possibility of the procreation of a child was held responsible for the consequences in *Stephen K.*, how much more so should a man be held responsible for giving his express consent to a medical procedure that was *intended* to result in the procreation of a child. Thus, it makes no difference that John's wife Luanne did not become pregnant. John still engaged in "procreative conduct." In plainer language, a deliberate procreator is as responsible as a casual inseminator.[18]

## Conclusion

Even though neither Luanne nor John are biologically related to Jaycee, they are still her lawful parents given their initiating role as the intended parents in her conception and birth. And, while the absence of a biological connection is what makes this case extraordinary, this court is hardly without statutory basis and legal precedent in so deciding. Indeed, in both the most famous child custody case of all time,[19] and in our Supreme Court's *Johnson v. Calvert* decision, the court looked to *intent to parent* as the ultimate basis of its decision.[20] Fortunately, as the *Johnson* court also noted, intent to parent " 'correlate[s] significantly' " with a child's best interests. (*Johnson v. Calvert, supra*, 5 Cal.4th at p. 94, quoting Schultz, *op. cit. supra*, Wis. L.Rev., at p. 397.) That is far more than can be said for a model of the law that renders a child a legal orphan.[21]

Again we must call on the Legislature to sort out the parental rights and responsibilities of those involved in artificial reproduction. No matter what

---

[18]This specific point was urged by Attorney Shear, counsel for amicus curiae Association of Certified Family Law Specialists, at oral argument. The phrase "casual inseminator" was coined by Justice Mosk in his concurring opinion in *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 797 [218 Cal.Rptr. 39, 705 P.2d 362].

[19]See 1 Kings 3: 25-26 (dispute over identity of live child by two single women, each of whom had recently delivered a child but one child had died, resolved by novel evidentiary device designed to ferret out intent to parent).

[20]While in each case intent to parent was used as a tiebreaker as between two claimants who either had or claimed a biological connection, it is still undeniable that, when push came to shove, the court employed a legal idea that was *unrelated* to any necessary biological connection.

[21]It is significant that even if the *Johnson* majority had adopted the position of Justice Kennard advocating best interest as the more flexible and better rule (see 5 Cal.4th at p. 118 (dis. opn. of Kennard, J.)) there is no way the trial court's decision could stand. Luanne has cared for Jaycee since infancy; she is the only parent Jaycee has ever known. It would be unthinkable, given the facts of this case and her role as caregiver for Jaycee, for Luanne not to be declared the lawful mother under a best interest test.

As for the father, John would not be the first man whose responsibility was based on having played a role in causing a child's procreation, regardless of whether he really wanted to assume it.

one thinks of artificial insemination, traditional and gestational surrogacy (in all its permutations), and—as now appears in the not-too-distant future, cloning and even gene splicing—courts are still going to be faced with the problem of determining lawful parentage. A child cannot be ignored. Even if all means of artificial reproduction were outlawed with draconian criminal penalties visited on the doctors and parties involved, courts will still be called upon to decide who the lawful parents really are and who—other than the taxpayers—is obligated to provide maintenance and support for the child. These cases will not go away.

Courts can continue to make decisions on an ad hoc basis without necessarily imposing some grand scheme, looking to the imperfectly designed Uniform Parentage Act and a growing body of case law for guidance in the light of applicable family law principles. Or the Legislature can act to impose a broader order which, even though it might not be perfect on a case-by-case basis, would bring some predictability to those who seek to make use of artificial reproductive techniques. As jurists, we recognize the traditional role of the common (i.e., judge-formulated) law in applying old legal principles to new technology. (See, e.g., *Hurtado* v. *State of California* (1884) 110 U.S. 516, 530 [4 S.Ct. 111, 118, 28 L.Ed. 232] ["This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law."]; *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [115 Cal.Rptr. 765, 525 P.2d 669] ["in the common law system the primary instruments of this evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them"].) However, we still believe it is the Legislature, with its ability to formulate general rules based on input from all its constituencies, which is the more desirable forum for lawmaking.

That said, we must now conclude the business at hand.

(1) The portion of the judgment which declares that Luanne Buzzanca is not the lawful mother of Jaycee is reversed. The matter is remanded with directions to enter a new judgment declaring her the lawful mother. The trial court shall make all appropriate orders to ensure that Luanne Buzzanca shall have legal custody of Jaycee, including entering an order that Jaycee's birth certificate shall be amended to reflect Luanne Buzzanca as the mother.

(2) The judgment is reversed to the extent that it provides that John Buzzanca is not the lawful father of Jaycee. The matter is remanded with directions to enter a new judgment declaring him the lawful father. Consonant with this determination, today's ruling is without prejudice to John in future proceedings as regards child custody and visitation as his relationship

with Jaycee may develop.[22] The judgment shall also reflect that the birth certificate shall be amended to reflect John Buzzanca as the lawful father.

(3) To the degree that the judgment makes no provision for child support it is reversed. The matter is remanded to make an appropriate permanent child support order. Until that time, the temporary child support order shall remain in effect. (See *Jaycee B.* v. *Superior Court, supra,* 42 Cal.App.4th at p. 730.)

Luanne and Jaycee will recover their costs on appeal.

Wallin, J., and Crosby, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 10, 1998.

---

[22]Luanne has had actual physical custody of Jaycee from the beginning. Obviously, it would be frivolous of John to seek custody of Jaycee right now in light of that fact. However, as the lawful father he certainly must be held to have the right, consistent with Jaycee's best interest, to visitation. Our decision today leaves Luanne and John in the same position as any other divorced couple with a child who has been exclusively cared for by the mother since infancy.

And while it may be true that John's consent to the fertilization, implantation and pregnancy was done as an accommodation to allow Luanne to surmount a formality, who knows what relationship he may develop with Jaycee in the future? Human relationships are not static; things done merely to help one individual overcome a perceived legal obstacle sometimes become much more meaningful. (See, e.g., Nicholson, Shadowlands (1990) [play based on true story of prominent British author who married American citizen in Britain in perfunctory civil ceremony to allow her to remain in country; a deeper relationship then developed].)