[No. A109655. First Dist., Div. Four. Jan. 13, 2006.]

KRISTINE M., Plaintiff and Respondent, v.
DAVID P., Defendant and Respondent;
SETH M., Objector and Appellant.

784

## Counsel

Donna Furth for Objector and Appellant.

No appearance for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

## Opinion

**REARDON, Acting P. J.**—Parents have no right, in California, to waive or limit by agreement a child's right to support. (Fam. Code,[1] § 7632; *K.M. v. E.G.* (2005) 37 Cal.4th 130, 144 [33 Cal.Rptr.3d 61, 117 P.3d 673]; *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410, 1426 [72 Cal.Rptr.2d 280].) Once paternity is established upon petition under the Uniform Parentage Act (UPA) (§ 7600 et seq.), can parents nonetheless ask the court to terminate the father's parental rights pursuant to their stipulation and as a matter of convenience in order to guarantee that contact between the father and child will end as will the father's obligation to support the child in the future? The answer is "No." Public policy intervenes to protect the child's continued right to support. A judgment so terminating parental rights and the attendant obligation to support the child is void as a breach of public policy and as an act in excess of the court's jurisdiction.

Seth M., through court-appointed counsel, appeals from such an order terminating the parental rights and obligations of his father, respondent David P. Neither David, nor Seth's mother, respondent Kristine M., has filed a responding brief. We reverse.

---

[1] Unless otherwise noted, all further statutory references are to the Family Code.

## I. BACKGROUND

Seth was born in September 2002. He had surgery in December of that year to repair a cleft lip and cleft palate. David saw Seth when he was born, on the day he underwent surgery, and on three occasions in 2003.

In February 2003 Kristine filed a petition to establish parental relationship between Seth and David. David did not respond to the petition and thereafter Kristine sought temporary orders regarding visitation, custody and support. This time David responded and requested genetic testing.

At the hearing the court found that David was Seth's father "[p]er [p]aternity testing." The parties entered the following stipulation on the record: David is Seth's father; father consents to termination of all parental rights and any eventual adoption of Seth; the parties agree that father pay mother a lump sum of $6,500 by June 25, 2004, in lieu of child support and child care arrears, or $9,000 ($500 per month by wage assignment) in the event of breach; and mother waives child support after June 1, 2004. The court asked the parties to brief the issue of its authority to terminate parental rights in the absence of a contemplated adoption and, on its own motion, appointed counsel for Seth.

Counsel for mother argued that because father was in the Navy, lived in Southern California and lacked interest in pursuing a relationship with Seth, it would not be in the boy's best interest to have very sporadic contact with his father. In a nutshell, the parties had "come to a knowing and voluntary and intelligent decision, to decide and stipulate what they believe is in Seth's best interest."

Counsel further maintained that public policy does not require every child to have two supporting parents. Finally, counsel asked why Kristine should not have the same "rights" to raise Seth as a single parent as a woman who receives in vitro fertilization by an anonymous donor.

Relying on section 7800[2] and its predecessor, counsel for father took the position that proceedings to terminate parental rights are not necessarily linked to a pending or contemplated adoption. Further, termination of David's parental rights "will enable Ms. [M.] to raise Seth free from future efforts by Mr. [P.] to reinsert himself into Seth's life after significant periods with no contact and no involvement."

Counsel for the minor contended that when adoption is not contemplated, birth parents are *not* free to stipulate away their duties and obligations to a

---

[2] These provisions detail the procedures and requirements for declaring a minor free from the custody and control of a parent. This is *not* a proceeding under section 7800 et seq.

child they conceived; nor can they stipulate away the child's inheritance rights or agree to terminate the jurisdiction of the court on the matter of child support.

The trial court accepted the parties' stipulation as an adequate basis to terminate David's parental rights. It posed the question this way: "[W]hether parents should be allowed to agree on parentage, whether that decision is made before or after conception," concluding that "both parents appear competent and their decisions should be given due weight." In reaching this decision the court accepted as valid the parties' point "that parents, after traditional conception, should have the same ability to decide whether a child is raised by one or two parents as those parents who make that decision prior to conception."

Upon receiving David's health history, the court terminated his parental rights and obligations. This appeal, by counsel for the minor, followed.

## II. DISCUSSION

█ Public policy and common sense endorse, where possible, creation of a legal parent and child relationship,[3] with the attendant responsibilities and privileges. In this regard, as part of the enactment of a system for voluntary declaration of paternity, our Legislature has declared a "compelling state interest in establishing paternity for all children. Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including . . . social security, health insurance, survivors' benefits, military benefits, and inheritance rights." (§ 7570, subd. (a).) And, as our Supreme Court recently explained, "[b]y recognizing the value of determining paternity [in section 7570], the Legislature implicitly recognized the value of having two parents, rather than one, as a source of both emotional and financial support . . . ." (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 123 [33 Cal.Rptr.3d 46, 117 P.3d 660]; see *id.* at pp. 119, 125 [holding that a child can have two mothers under the UPA].)

The duty of a parent to support his or her child, now found in section 3900,[4] was first codified at former Civil Code section 196 as part of the 1872 enactment of the initial system of codes in California. (See 6 West's Ann. Civ.

---

[3] Section 7601 of the UPA defines "parent and child relationship" as "the legal relationship existing between a child and the child's natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations. The term includes the mother and child relationship and the father and child relationship."

[4] Section 3900 states that "the father and mother of a minor child have an equal responsibility to support their child in the manner suitable to the child's circumstances."

Code (1982 ed.) p. V; Historical Note, 6 West's Ann. Civ. Code, *supra*, foll. § 196, p. 385.) Effective January 1, 2005, registered domestic partners are also deemed by California law to be the parents of a child born to or adopted by either of them during the relationship, with all the rights *and obligations* owed by parents to their children under the Family Code. (§ 297.5.)[5] This same public policy is reflected in the principles which the Legislature has articulated to guide trial courts in implementing the statewide uniform system of child support, namely that (1) "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life"; and (2) "[b]oth parents are mutually responsible for the support of their children." (§ 4053, subds. (a), (b).)

█ Not surprisingly, public policy also prohibits a parent from waiving or limiting, by agreement, a child's right to support. (*K.M. v. E.G., supra*, 37 Cal.4th at p. 144.) Section 7632 specifically provides that regardless of the terms of any private agreement between a mother and an alleged or presumed father, such agreement does *not* bar an action to determine paternity under the UPA. The UPA protects the child's right to establish paternity and obtain support irrespective of a parent's intent to foreclose that right. (*County of Shasta v. Caruthers* (1995) 31 Cal.App.4th 1838, 1849 [38 Cal.Rptr.2d 18].)

If, however, a parent or parents consent to a child's adoption through independent[6] or stepparent[7] adoption proceedings, the outcome with respect to the duty to support may be different. In these circumstances the court can enter an order of adoption of the child by the prospective parent or parents if it is satisfied that "the interest of the child will be promoted by the adoption." (§ 8612, subd. (c).) From the time of the adoption, the birth parents[8] ordinarily are "relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child." (§ 8617.) Nonetheless a birth parent may waive section 8617 in order to preserve his or her legal relation with the child and coparent the child with the adoptive parent, as in the case of stepparent and second parent adoptions. (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 427, 434–435 [2 Cal.Rptr.3d 699, 73 P.3d 554].)

---

[5] The recent case of *Elisa B. v. Superior Court, supra,* 37 Cal.4th 108 settles certain parentage and parental obligation issues arising prior to 2005 with respect to same sex couples who were not registered domestic partners. There the district attorney prosecuted an action for child support against a woman who had agreed to raise children with her former partner, supported the partner's artificial insemination using an anonymous donor, and received the resulting twin children into her home, holding them out as her own. The Supreme Court concluded that this woman was the twins' parent under the UPA, and had an obligation to support them. (37 Cal.4th at p. 113.)

[6] Section 8800 et seq.

[7] Section 9000 et seq.

[8] A "birth parent" is "the biological parent or, in the case of a person previously adopted, the adoptive parent." (§ 8512.)

Here, the court determined that David was Seth's father. David did not and does not challenge that determination. Nonetheless, with no prospective adoption or any indication in the record of the probability of adoption, the court granted the parties' request to honor their stipulation and terminate David's parental rights. The request for termination, although couched in terms of the parents' assessment of Seth's best interest, was in fact intended to serve their personal convenience: convenience not to have David insert himself in Seth's and Kristine's lives in the future, and convenience that David not be burdened with child support or other parental obligations.

The trial court was swayed in part by cases cited by the parties "in which the courts have upheld agreements made by the parties prior to the conception of the child, i.e. artificial insemination, surrogacy and same sex parentage cases (three of which are presently under review by the California Supreme Court; KM v. EG 118 CA4th 477 [13 Cal.Rptr.3d 136] [, review granted Sept. 1, 2004, S125643], Elisa Maria B. v. Superior Court 118 CA4th 966 [13 Cal.Rptr.3d 494] [, review granted Sept. 1, 2004, S125912] and Kristine Rene H. v. Lisa Ann R. 120 CA4th 143 [16 Cal.Rptr.3d 123] [, review granted Sept. 1, 2004, S126945])." The court went on to credit the parties' argument that they should have the same right to decide, postbirth, whether their child would be raised by one or two parents as persons who, cooperating to bring children into this world through assisted reproduction, decide in advance who will and will not be parents.

Therein lies the fallacy of the court's decision. First, not all such preconception agreements are determinative of parenthood. For example, in *K.M. v. E.G.*, in reversing the Court of Appeal decision referenced above and relied on by the parties and the court, our Supreme Court held that a waiver of parental rights on the part of a woman who donated her ova to her partner in advance of implantation of embryos *did not* affect determination of parentage under the UPA. (*K.M. v. E.G.*, *supra*, 37 Cal.4th at p. 144.)

Second, the court failed to discern the profound differences between preconception and postbirth agreements. Where, as in *Johnson v. Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776], the court honored a preconception agreement, it did so in recognition that *without* the deliberative, acted-on intention of the couple who sought reproductive assistance, *no child would have been born.* (*Id.* at p. 93 [holding that husband and wife, not the surrogate mother, were the natural parents of the child born as a result of the implantation of the couple's zygote in the surrogate mother's uterus. The surrogacy agreement provided that the child born would be the couple's child, and the surrogate mother would relinquish parental rights, in return for certain monetary benefits].) Thus, as Professor Schultz has observed in legal commentary, "[w]ithin the context of artificial reproductive techniques,

intentions that are voluntarily chosen, deliberate, express and bargained-for ought presumptively to determine legal parenthood." (Schultz, *Reproductive Technology and Intent-Based Parenthood: An Opportunity for Gender Neutrality* (1990) Wis. L.Rev. 297, 323, fn. omitted; see *Johnson v. Calvert, supra,* 5 Cal.4th at p. 94.)

■ However, where, as here, procreation occurs through normal sexual reproduction, a decision regarding parenthood made *after* the child's birth is one of an entirely different character. The parties in this case freely engaged in an act which resulted in the conception and birth of Seth. David is held responsible for the consequences of that act because the court has found him to be Seth's father "[p]er [p]aternity testing," not because of some preconception intention which, in light of human nature, would play an inherently more ambiguous role than in the case of assisted reproduction. Notwithstanding such ambiguity, with the status of parent conferred upon David by the court in this action under the UPA, the law has deemed him to have intended the natural consequences of his actions. Under these circumstances, the public policies favoring creation of a father-child relationship as a source of emotional and financial support, and declaring the preeminence of a parent's obligation to support his or her minor children, trump any policy that would favor private ordering of parenthood *after* the birth of a child.

■ Further, the order severing David's parental rights was beyond the court's power to render. " '[E]stablishment of the parent-child relationship is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic of constitutional rights.' " (*County of Shasta v. Caruthers, supra,* 31 Cal.App.4th at p. 1849.) Likewise, parents have a fundamental liberty interest in the custody, care, management and companionship of their children. (*In re B. G.* (1974) 11 Cal.3d 679, 688–689 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re Sara D.* (2001) 87 Cal.App.4th 661, 668 [104 Cal.Rptr.2d 909].) Given the supremacy of these familial rights—of the child and of the parent—a decision to terminate parental rights is one of the gravest a court can make. Thus it is only under specified circumstances, and upon specific findings that include the interests of the child, that a court has authority to terminate parental rights. These circumstances are confined to special proceedings related to implementation of permanent plans in dependency cases (Welf. & Inst. Code, § 366.26), actions to declare a minor free from parental custody and control (§ 7800 et seq.) and adoptions (§§ 7660 et seq., 8600 et seq.). The circumstances giving rise to such proceedings are not present in this case. Moreover, the court accorded primacy to the parents' convenience and decision, rather than to the long-term interests of Seth. Further, in balancing the potential monetary benefits to Seth versus the parents' personal decision concerning parenthood, the court stated that "the parties agree that there won't be a true emotional parental relationship between Seth and Mr. [P.]." The court is not a seer, and cannot divine the future needs

of Seth or the circumstances or emotional state of his mother or his father. How can matters that reside in the realm of human emotion and the bonds of intimacy be subject to contract or agreement, let alone serve as a basis for a court decision?

## III.  DISPOSITION

The order terminating David's parental rights and his obligation to contribute financially to Seth's well-being is reversed. Respondents to share costs on appeal.

Sepulveda, J., and Rivera, J., concurred.