[No. B151028. Second Dist., Div. One. Oct. 29, 2002.]

DONNA PRATO-MORRISON et al., Plaintiffs and Appellants, v. JUDITH DOE et al., Defendants and Respondents.

## COUNSEL

Brian K. Brandmeyer; Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Plaintiffs and Appellants.

Law Offices of Edward M. Bialack and Edward M. Bialack for Defendants and Respondents.

## OPINION

**VOGEL (MIRIAM A.), J.**—Donna Prato-Morrison and Robert Morrison engaged the services of a fertility clinic, to no avail, and ultimately abandoned their efforts to conceive, believing their unused genetic materials would be destroyed. When the clinic later became the target of an investigation into its widespread misuse of genetic materials, the Morrisons (along

with many others) sued the clinic and later settled their claims for an undisclosed amount of money. The Morrisons, "wondering whether [they have] a genetic child or children in the world," then embarked on a campaign to intrude into the lives of another fertility clinic family (Judith and Jacob Doe) who might have innocently received Donna Morrison's genetic material. The Morrisons filed a complaint in which they asked the court to determine whether they are the genetic parents of the Does' twin daughters (now almost 14 years old) and, if so, to grant custody of the children (who know nothing about this claim and who have no reason to question their parentage) to the Morrisons. Although the Morrisons later withdrew their request for custody, they continued their efforts to compel blood tests and obtain the right to visit the twins.

The Does sought protective orders and moved to quash the Morrisons' complaint. When the Morrisons were unable to present any admissible evidence to establish a connection between their genetic material and the fertility services received by the Does, the trial court granted the Does' motion to quash and dismissed the Morrisons' complaint. The Morrisons appeal, claiming the trial court should have either admitted their inadmissible evidence or otherwise concluded that the Morrisons' curiosity justified a further intrusion into the Does' lives. We reject the Morrisons' claims and affirm. We hold that the Morrisons' evidence was properly excluded, and that they have not shown any link at all to the Does' daughters. We also hold that, assuming a genetic connection between the Morrisons and the twins, the best interests of the children dictate the result reached by the trial court.

FACTS

A.

In 1988, Donna Prato-Morrison and Robert Morrison were fertility clinic patients of the Center for Reproductive Health (CRH) at the University of California at Irvine (UCI). As part of the *in vitro* fertilization process, the Morrisons' eggs and sperm were entrusted to CRH with the intent that the resulting embryos would produce the child they hoped to conceive. No pregnancy was achieved and the Morrisons ultimately abandoned their efforts on the assumption that any remaining genetic material would be destroyed by CRH.

B.

In the mid-1990's, UCI learned there had been medical and other improprieties at CRH. An investigation ensued, and findings were made that "egg

stealing" had occurred—"human eggs were taken from one patient and implanted in another without the consent of the donor." (*Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 740 [92 Cal.Rptr.2d 94].) The Morrisons (and many others) sued CRH, UCI, and the doctors involved in the "egg stealing." The Morrisons' case was settled by the payment of money—but only after the Morrisons learned through the discovery process that their genetic material might not have been destroyed, that Judith and Jacob Doe (who were also patients of the CRH fertility clinic) *might have* (without the Does' knowledge) received the Morrisons' eggs, sperm, or embryos, and that (in December 1988) Judith Doe had given birth to twin daughters, Ida and Rose. The Morrisons claim they are the twins' genetic parents.

## C.

In 1996, the Morrisons filed a "complaint to establish parental relationship," naming the Does as defendants, alleging that the Morrisons are the "biological and legal parents" of the twins, and asking for custody, visitation rights, and an award of attorney's fees. Between 1996 and 1999, the Morrisons attempted to obtain blood tests and DNA samples from the twins but the Does refused to provide them and these "negotiations" ultimately failed.

In 1999, the Morrisons filed an amended complaint in which they abandoned their quest for custody but reasserted their demands for blood tests and for visitation. At the Morrisons' request, a hearing was set to determine the Morrisons' right (1) to obtain DNA tests and (2) to have a mental health professional appointed to help determine "the commencement, frequency, degree of contact or visitation" the Morrisons should have with the twins. The matter was continued from time to time.[1]

In April 2000, the Does asked the trial court (1) to seal the records of this case; (2) to issue protective orders "to ensure the privacy of the children in

---

[1]In a declaration filed in October 1999, the Does' lawyer told the court the Morrisons are both employed as sheriff's deputies in Northern California; that the Morrisons' lawyer had told him that the Morrisons had engaged private investigators to locate and investigate the Does and their family, to engage in "surveillance" of the Does and the twins, to photograph the twins, and to obtain private information about the Does' home, their treatment of the twins, and the details of the twins' "home and school situations." According to the Does' lawyer, his conversations with the Morrisons' lawyer "were punctuated by thinly veiled threats that [the Morrisons] would reveal their claims to [the twins]. On several occasions, [the Morrisons' lawyer] made statements to the effect that the information could not be kept from the children, and that the 'facts' would be known to the children even if their parents opposed such disclosures. The message was clear that if [the Does] were unwilling to introduce [the Morrisons] into the children's lives, that the litigation process would inevitably bring the matter to the children's attention. [¶] . . . [¶] My conversations with [the Morrisons' lawyer] led me to believe that [Donna Morrison] is obsessed with the notion that [the Does' children] are 'theirs,' and that she [is] willing and able to contact the children directly."

this potentially high-profile litigation, and to preclude deliberate or accidental disclosure of the existence of this litigation and the [Morrisons'] claims . . . to the children"; and (3) to quash the Morrisons' petition on the grounds (among others) that (a) the Does are the "presumed natural and legal parents" of the twins, and (b) the Morrisons lacked standing to pursue a parentage action or to compel blood or DNA testing. (Fam. Code, §§ 7540, 7610, subd. (a), 7611, subd. (a), 7630, 7631, 7541, 7643, 7650.)[2]

In support of their motions, the Does submitted declarations establishing that since 1983 they have lived together continuously as husband and wife, that in addition to the twins they have two older children (one from Jacob's former marriage, the other together), and that the twins were conceived because the Does had "actively tried to conceive with medical assistance, intending to use Jacob's sperm and anonymously and voluntarily donated ova." Judith Doe "became pregnant by [her] husband," gave birth to the twins, and remains a "full time mother." Jacob Doe was "neither impotent nor sterile" at the time the twins were conceived or at the time they were born, and he is their father (as well as the father of the Does' two older children). When Judith Doe gave birth to the twins, the Does "knowingly and joyously received the twins into [their] home and family. [They] have adored [the twins and have] reared them in [the Does'] culture and religion . . . ." The Does "are the only parents that Ida and Rose have ever known." The Does objected to the release of any medical information to the Morrisons, pointed out that the Morrisons' claims had caused "great emotional stress" to the Does, and said the introduction of the Morrisons into the Does' "family life would be a monstrous intrusion."

In opposition to the Does' motion to quash, the Morrisons claimed they had standing to pursue this action because Donna Morrison is "a genetic mother." To prove this point, the Morrisons submitted a copy of a 1996 letter from UCI to the Morrisons and a copy of an unauthenticated "redacted copy" of one handwritten page of "the seven page Teri Ord donor/recipient list in which" Donna Morrison's name appeared. Other than by name, the Morrisons did not identify "Teri Ord" or explain her relationship to these proceedings. The Does objected to the Morrisons' "evidence," pointing out that the unauthenticated list contained privileged information and did not connect the Morrisons to the Does or to anyone, genetically or otherwise. (Evid. Code, §§ 994, 1400, 1401.)

### D.

At a hearing held in June 2000, the family law court sustained the Does' objections to the Morrison's evidence and found that the Morrisons had

---

*The Morrisons have never suggested that this description of their conduct is false or exaggerated.*

[2]Subsequent undesignated section references are to the Family Code.

failed to establish their status as "interested parties" entitled to pursue a parentage action. The court nevertheless continued the matter to afford the Morrisons an opportunity to present additional evidence.

As "additional evidence," the Morrisons submitted an unredacted copy of the handwritten list and a declaration from Teri Ord—who stated that she was employed from 1986 through and including 1988 by AMI Medical Center as an "I[n] V[itro] F[ertilization] Biologist" in charge of "the embryology lab at that facility." In that capacity, she states, she "participated" in "transfers of genetic materials obtained by the doctors [at UCI] from fertility patients. [¶] According to laboratory records, Donna [Morrison] was an infertility patient at AMI . . . between March and May 1988, as was [Judith Doe]." Ord stated that, based on information contained in other clinical and laboratory records, she prepared the handwritten document in *1995* to show that, "between March and May of *1988*, patient '[Judith Doe]' received sixteen eggs from patient '[Donna Morrison].' Twenty-one eggs were extracted from [Donna Morrison], and five transferred into [Donna Morrison's] own fallopian tubes. The remaining sixteen were transferred to [Judith Doe]," and the notations next to Judith Doe's name show that "a twin pregnancy resulted." (Italics added.) The Morrisons also submitted evidence that UCI's original clinical and laboratory records for its former patients were generally unavailable because they had been confiscated (in 1995) by the Federal Bureau of Investigation.[3]

The Does objected to Ord's declaration and compilation as hearsay, and on the ground that it violated the Does' physician-patient privilege and their right to reproductive privacy. In October 2000, the family law court sustained the Does' evidentiary objections and granted their motion to quash.[4] In April 2001, the court dismissed the Morrisons' action. The Morrisons appeal from the order of dismissal.

---

[3]In August 2000, one of the lawyers representing UCI in the "ongoing Coordinated Fertility Litigation" wrote to the Morrisons' lawyer to explain that, in September 1995, the FBI executed a number of search warrants and seized "some former CRH patient clinical records." According to UCI's lawyer, "the US Attorney has consistently taken the position that any records in their possession are part of an ongoing grand jury investigation and cannot be released to any outside sources." There is nothing in the record to suggest that the Morrisons contacted the U.S. Attorney or otherwise attempted to track down the CRH medical records.

[4]When the trial court sustained the evidentiary objection, the court stated: "[The Morrisons] have failed to meet any one of the four prongs [of the business record exception to the hearsay rule]. The Ord declaration merely states that Ms. Ord was in charge of the embryology lab and participated in the genetic transfers. The declaration further states that in 1995, which is approximately eight years after the purported transfer, Ms. Ord utilized clinical and laboratory records to prepare the list in question. The Ord declaration fails to establish whether she was present at the time of transfer or had any personal knowledge of the transfer. The declaration further fails to state why the handwritten list was made, what method was used, or what its mode of preparation was . . . ."

DISCUSSION

I.

■ The Morrisons contend their evidence is sufficient to establish Donna Morrison's status as the genetic mother and, therefore, her standing to pursue a parentage action. We disagree.

■ "Any interested person may bring an action to determine the existence or nonexistence of a mother and child relationship" (§ 7650), but an unrelated person who is not a genetic parent is not an "interested person" within the meaning of section 7650. (*West v. Superior Court* (1997) 59 Cal.App.4th 302, 306 [69 Cal.Rptr.2d 160]; *Johnson v. Calvert* (1993) 5 Cal.4th 84, 90 [19 Cal.Rptr.2d 494, 851 P.2d 776]; *Curiale v. Reagan* (1990) 222 Cal.App.3d 1597, 1598-1600 [272 Cal.Rptr. 520].) ■ The threshold question, therefore, is whether Ord's declaration and handwritten list were properly excluded by the trial court. If so, there is no evidence at all to suggest that Donna Morrison is the twins' genetic mother, or that either of the Morrisons is otherwise related to the twins.

The declaration and list were properly excluded as inadmissible hearsay that does not satisfy the requirements of the business records exception to the hearsay rule.[5] As Ord concedes in her declaration, the list was compiled from other, non-identified clinical and laboratory records, and she does not attempt to establish her personal knowledge of the information stated on her list.[6] She does not say she was a percipient witness to the transfers of genetic material, or that she made the entries in the original records. She admits the list was not made at or near the time of the events it purports to describe, but was in fact made almost eight years later. She offers no clue as to *why* the

---

[5]Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

[6]Ord states that, while employed by AMI, she "created and maintained records reflecting the disposition of genetic materials taken from and received by infertility patients. These records were maintained on standard forms including: Egg Sheets, Sperm Sheets, Series Sheets and a Frozen Embryo Log Book, collectively referred to hereinafter as 'clinical and laboratory records.' " But she does not say she created or maintained such records for *all* of AMI's patients, or that she created or maintained such records for Donna Morrison or Judith Doe or their husbands, and she concedes that these records were, at some unstated time between 1988 and 1995, transferred from the AMI Medical Center of Garden Grove to UCI. She says she continued to work with the doctors at UCI in the infertility clinic, but she does not say she had control of the records after they were transferred from AMI to UCI.

list was made. By Ord's own admission, her sources of information and method and time of preparation show a lack of trustworthiness and defeat the Morrisons' contention that the list comes within the business records exception to the hearsay rule. (Evid. Code, §§ 1270-1272; *Daniels v. Department of Motor Vehicles* (1983) 33 Cal.3d 532, 537-538 [189 Cal.Rptr. 512, 658 P.2d 1313]; *Dahl-Beck Electric Co. v. Rogge* (1969) 275 Cal.App.2d 893, 902 [80 Cal.Rptr. 440].)

To avoid this conclusion, the Morrisons contend the unavailability of the original records in itself makes Ord's statements and her list admissible. We disagree. When an original document is missing, secondary evidence offered to prove its content must be "otherwise admissible." (Evid. Code, §§ 1521, 1523.)[7] Since the list and Ord's statements are inadmissible hearsay, they are not "otherwise admissible." As the trial court put it when it sustained the Does' objection, secondary evidence must "meet the threshold requirement of being trustworthy." (*Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 784-785 [142 Cal.Rptr. 1].)

Since Ord's declaration and list were properly excluded and since there is no other evidence suggesting a genetic link between the Morrisons and the Does' twins, the Morrisons had no standing to pursue their parentage action.

## II.

■ The Morrisons contend they should be allowed to "discover" whether the twins were born "as a result of the theft of their genetic materials," and that their rights as alleged biological parents ought to trump the Does' rights as presumed parents. We disagree.[8]

The Morrisons' "rights" were vindicated when they accepted an undisclosed amount of money to resolve their lawsuit against CRH, UCI, and the

---

[7]Evidence Code section 1521 provides: "(a) The content of a writing may be proved by otherwise admissible secondary evidence. The court shall exclude secondary evidence of the content of the writing if the court determines either of the following: [¶] (1) A genuine dispute exists concerning material terms of the writing and justice requires the exclusion. [¶] (2) Admission of the secondary evidence would be unfair. [¶] (b) Nothing in this section makes admissible oral testimony to prove the content of a writing if the testimony is inadmissible under section 1523 (oral testimony of the content of a writing). [¶] (c) Nothing in this section excuses compliance with Section 1401 (authentication). [¶] (d) This section shall be known as the 'Secondary Evidence Rule.' "

[8]As the Morrisons necessarily concede, the Does are the twins' presumed parents. The undisputed evidence establishes that Judith Doe has at all times intended to raise the twins as her own, that she in fact gave birth to the twins, that Jacob Doe was not impotent or sterile at the time the twins were conceived, and that he was living with (and married to) Judith Doe both at the time of the twins' conception and at their birth. (See § 7650; *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1112 [39 Cal.Rptr.2d 535]; §§ 7540, 7611, subds. (a), (d) [the man who is not impotent or sterile and who is cohabiting with the mother at the time of the child's conception and birth and who holds the child out as her own, is conclusively presumed to be the child's father]; *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937, fn. 4 [72

individuals involved in the misuse of the Morrisons' genetic materials. The rights still at issue are not the Morrisons' rights. They are the rights of the Does and their twins to be free from the interference of strangers who have no standing to pursue their demands for blood tests or visitation rights, and the Morrisons cannot alter the focus of this issue by characterizing the Does' rights as mere privacy interests that may, under appropriate circumstances, give way to greater rights. (*Dawn D. v. Superior Court, supra,* 17 Cal.4th at p. 944; cf. *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633].)[9]

The trial court found, and we agree, that the dismissal of this action is in the best interests of the children. More to the point, we conclude that, had the Morrisons presented proof of a genetic link to the twins sufficient to establish their standing to pursue a parentage action, it would not be in the best interests of the twins to have the Morrisons intrude into their lives, or to be subjected to the blood tests and "mental health" evaluation suggested by the Morrisons. Because the twins are now almost 14 years old, their relationship with their presumed parents is considerably more palpable than the possibility of a new relationship with a previously unknown biological parent, and the Morrisons will not be allowed to disrupt the Does' "family in order to satisfy the [alleged] biological [parents'] unilateral desire, however strong, to turn their genetic connection into a personal relationship." (*Dawn D. v. Superior Court, supra,* 17 Cal.4th at p. 947; *Steven W. v. Matthew S., supra,* 33 Cal.App.4th at pp. 1116-1117; *Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1200-1201 [92 Cal.Rptr.2d 294] [substantive rules of paternity law will not be applied when their effect would be to "terminat[e] an *existing* father-child relationship"]; *In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1446 [53 Cal.Rptr.2d 439]; *In re Raphael P.* (2002) 97 Cal.App.4th 716, 730 [118 Cal.Rptr.2d 610] [social relationships may trump genetics in cases where legal recognition of a genetic parent would upset an existing parent-child relationship between the presumed parents and the child].)

Simply put, the social relationship established by the Does and their daughters is more important to the children than a genetic relationship with

---

Cal.Rptr.2d 871, 952 P.2d 1139]; § 7610, subd. (a) [proof of the natural mother's parentage is established by proof that she gave birth to the child]; *Johnson v. Calvert, supra,* 5 Cal.4th at pp. 89-93; *Jaycee B. v. Superior Court* (1996) 42 Cal.App.4th 718, 728-730 [49 Cal.Rptr.2d 694].)

[9]We do not question the Morrisons' right to recover damages from UCI, CRH, and the doctors who lied to the Morrisons and others who used their services. Our point is that the wrongdoers who were obligated by law to compensate the Morrisons have done so, and that it serves no legitimate purpose to inflict a new injury on innocent third parties such as the twins and the Does.

a stranger. (*Dawn D. v. Superior Court, supra,* 17 Cal.4th at pp. 941-942 [absent some prior social relationship with a child, an alleged biological link is insufficient to support a demand for an opportunity to establish a parental relationship with the child]; *Steven W. v. Matthew S., supra,* 33 Cal.App.4th at pp. 1116-1117.)[10]

## DISPOSITION

The order of dismissal is affirmed. The Does are awarded their costs of appeal.

Spencer, P. J., and Ortega, J., concurred.

---

[10]We join the chorus of judicial voices pleading for legislative attention to the increasing number of complex legal issues spawned by recent advances in the field of artificial reproduction. Whatever merit there may be to a fact-driven case-by-case resolution of each new issue, some overall legislative guidelines would allow the participants to make informed choices and the courts to strive for uniformity in their decisions. (*In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410, 1428-1429 [72 Cal.Rptr.2d 280, 77 A.L.R.5th 775]; *Johnson v. Calvert, supra,* 5 Cal.4th at p. 101.)