[No. H024926. Sixth Dist. June 13, 2003.]

ROBERT B., Plaintiff and Respondent,
DENISE B., Plaintiff and Appellant, v.
SUSAN B., Defendant and Appellant.

**COUNSEL**

Lawrence A. Gibbs for Plaintiff and Appellant.

Marjorie Shultz; Gradstein & Gorman, Marc Gradstein and Jane A. Gorman for Defendant and Appellant.

George M. Mavris; Reed Smith Crosby Heafey, Paul D. Fogel and Raymond A. Cardozo for Plaintiff and Respondent.

---

**OPINION**

**ELIA, J.**—At the center of this parentage action is two-year-old Daniel B., who was born to appellant Susan B., a single woman, after a fertility clinic implanted embryos belonging to Robert and Denise B. into Susan. The trial court ruled that Susan is Daniel's mother and Robert is his father. Denise was dismissed for lack of standing.

Both Susan and Denise appeal. Susan contends that the court erred by failing to apply Family Code section 7613, subdivision (b)[1] to preclude Robert's paternity claim. Denise contends that the court improperly dismissed her because she had standing as an "interested person" under section 7650. We find no error and affirm the judgment.

### Background

In May 2000 Robert and Denise B. contracted with an anonymous ovum donor to obtain the donor's eggs for fertilization with Robert's sperm. The contract reflected the intent of the contracting parties that Robert and Denise would be the parents of any children produced from the resulting embryos.

---

[1] All further statutory references are to the Family Code.

Meanwhile, Susan went to the same fertility clinic with the intent of purchasing genetic material from "two strangers who would contractually sign away their rights" so that "there would be no paternity case against her, ever." She therefore contracted with the clinic for an embryo created from anonymously donated ova and sperm.

About 13 embryos were produced for Robert and Denise. In June 2000 some of them were implanted in Denise's uterus. Through an apparent clinic error, Susan received three of these embryos. When she became pregnant, Susan believed that the child she was carrying was the result of the anonymous donation procedure for which she had contracted. In February 2001, 10 days apart, Susan gave birth to Daniel and Denise gave birth to Daniel's genetic sister, Madeline.

In December 2001 the fertility physician informed Robert and Denise that "a mistake had occurred," in that the clinic had "inadvertently" implanted some of Robert and Denise's embryos in Susan's uterus, resulting in Daniel's birth. Robert and Denise promptly sought contact with Daniel. Susan was initially receptive, but after the three adults and two children met, she refused to relinquish custody, and Robert and Denise brought this parentage action.[2]

Over Susan's opposition the trial court determined that Robert had standing to bring a paternity action under section 7630, subdivision (c), and it ordered genetic testing.[3] After receiving the test results, the court declared Robert to be the father of Daniel.

The court next took up the question of Denise's standing, an issue it had deferred. Denise argued that while she was not biologically related to Daniel, she "st[ood] in the shoes of a genetic mother" because the ovum donor had "assigned whatever [parental] rights she had" to Denise. Denise further sought to preserve the question of whether Susan had acted criminally to obtain Robert and Denise's embryos. In order to determine whether any improper conduct had occurred, Denise argued, she needed to complete discovery. Consequently, she asked that the court withhold a determination of standing, or at least dismiss her from the action *without* prejudice.

The court, however, dismissed Denise with prejudice. The court noted that Susan was the gestational mother and that Denise had no genetic connection

---

[2]Susan insists to this day that she is willing to allow informal social contact between the two families.

[3]Susan challenged the order for genetic testing by writ petition, which this court summarily denied.

with Daniel, and it concluded that "there really is only one mother in this case at this point." Any contractual rights Denise had were to embryos, "but now what we're talking about is a live person, not an embryo." The court then proceeded to hear the issues regarding custody and visitation. Temporary custody was awarded to Susan, with temporary visitation to Robert.[4]

*Discussion*

1. *Susan's Appeal*

On appeal, Susan challenges the court's paternity order. Seeking a liberal construction of section 7613, subdivision (b) (section 7613(b)), Susan contends that Robert must be deemed a sperm donor in order to protect "the integrity of [her] single parent family unit." Any other result, she argues, would contravene the Legislature's intent to preserve the "procreative rights of unmarried women," unfairly burden her with a situation she had done her best to prevent, and impair "Daniel's established constitutional right to maintain a stable, permanent placement." Susan does not question the court's resort to section 7630, subdivision (c), as the authority for Robert's paternity action,[5] nor does she contend it was improper to order genetic testing to determine Robert's biological relationship to Daniel. (§ 7551.)

We need not go beyond the language of section 7613(b) to resolve Susan's claim. This provision states: "The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." As the trial court recognized, the plain meaning of the statutory language does not permit the application Susan urges. A "donor" is simply a person who gives, presents, or contributes. (Compact Edition of the Oxford Dict. (1971) p. 599, col. 3; Amer. Heritage College Dict. (3d ed. 1997) p. 411.) In order to be a donor under section 7613(b) a man must provide semen to a physician for the purpose of artificially inseminating "a woman other than the donor's wife." It is uncontested that Robert did not provide his semen for the purpose of inseminating anyone other than Denise. On the contrary, the consent form he signed indicated that the unused embryos were to be frozen and stored "for the exclusive use" of him and Denise. Consequently, section 7613(b) is inapplicable in these circumstances.

Because the language of section 7613(b) is clear, we will not engage in statutory construction to determine the intended purpose and scope of this

---

[4]The custody and visitation orders are not before us in the present appeal.

[5]Section 7630, subdivision (c), permits a man "alleging himself to be the father" to bring an action to determine the existence of the father-child relationship with respect to a child who has no presumed father.

provision. (See *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718] [if statutory language is clear and unambiguous, judicial construction is not necessary and a court should not indulge in it].) Susan's appeal to the "clear social policy supporting single parenthood" would more appropriately be directed to the Legislature.

Susan does not assert equal protection or any other constitutional ground for her assertion of the right to an intact single-parent family. The only constitutional claims she alludes to are Robert's assertion of a constitutional right to be recognized as Daniel's legal father and her argument that Daniel has a constitutional right to a stable and permanent placement. We need not address Robert's argument because his statutory right to establish paternity under section 7630 is uncontested. (Cf. *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230 [45 Cal.Rptr.2d 207, 902 P.2d 225] [court does not decide constitutional questions where other grounds are available and dispositive of the case]; *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 753 [120 Cal.Rptr.2d 550] ["constitutional issues ordinarily will be resolved on appeal only if 'absolutely necessary' and not if the case can be decided on any other ground"].) And Daniel's "constitutional right to . . . a stable, permanent placement" is not at issue in this appeal. Indeed, much of Susan's appellate argument is a misdirected attack on any *future* effort Robert and Denise *might* make to obtain custody of Daniel.[6]

## 2. *Denise's Appeal*

 Denise contends that she should be accorded standing as an "interested person" within the meaning of section 7650. She seeks an opportunity to show that Susan colluded with the fertility clinic to obtain the embryo and/or that she herself is the "intended" mother of Daniel.

Section 7650 permits "[a]ny interested person [to] bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of this part [the Uniform Parentage Act] applicable to the father and child relationship apply." On its face, this

---

[6]Susan suggests, for example, that it would violate due process to remove a child from a stable placement without a hearing to determine the harm he would suffer. She urges this court to intervene to prevent Robert and Denise from "escalating their quest to obtain custody of Daniel." Susan's argument, however, is based on speculation about events that may never come to pass. There was no issue of removing Daniel from Susan's custody at the August 2002 hearing. Indeed, Robert told the court that he was "not here to take her son." At that time he was not seeking custody; he wanted only visitation, an opportunity "to get to know [his] son." Upon further questioning by Susan's counsel and the court he insisted he wanted only an order that comported with the best interests of Daniel.

provision does not restrict the standing of alleged mothers to those who are genetically or gestationally related to the child.

Two appellate courts, however, have refused to recognize a biologically *unrelated* woman as an "interested person" under section 7650. Addressing a former lesbian partner's attempt to obtain recognition of her parental status for purposes of custody or visitation, the Third District stated: "Here, there is no . . . statutory standing. As a person unrelated to [the child], [the partner] is not an 'interested person' and, therefore, may not drag West [the genetic and gestational mother] into the courts, under the Uniform Parentage Act, on the issue of visitation with West's daughter." (*West v. Superior Court* (1997) 59 Cal.App.4th 302, 306 [69 Cal.Rptr.2d 160].) This holding was consistent with the court's previous decision in which it had stated that section 7650 (then Civ. Code, § 7015) "has no application where, as here, it is undisputed [that the gestational and genetic mother] is the natural mother of the child." (*Curiale v. Reagan* (1990) 222 Cal.App.3d 1597, 1600 [272 Cal.Rptr. 520].) In October 2002 the Second District, Division One, reached the same result. In *Prato-Morrison v. Doe* (2002) 103 Cal.App.4th 222 [126 Cal.Rptr.2d 509] (*Prato-Morrison*), a husband and wife suspected unauthorized use of their genetic material for another couple, who had used the same clinic and thus became the parents of twins. Responding to the plaintiff wife's assertion of standing, the appellate court quoted the "interested person" language of section 7650 and then added, "but an unrelated person who is not a genetic parent is not an 'interested person' within the meaning of section 7650." (*Prato-Morrison*, at p. 229.) Because the wife was unable to offer admissible evidence of a genetic relationship to the twins (who were by then almost 14 years old), she had no standing to pursue a parentage action. (But see *Rubano v. DiCenzo* (R.I. 2000) 759 A.2d 959, 967 ["any interested party" may be person alleging a "parent-like relationship"].)

Denise disputes the holding of *Prato-Morrison*, arguing that it is inconsistent with *Johnson v. Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776] and *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410 [72 Cal.Rptr.2d 280, 77 A.L.R.5th 775] (*Buzzanca*), on which she relies. Neither of these cases, however, provides support for Denise's claim. In *Johnson v. Calvert*, the Supreme Court made it clear that "California law recognizes only one natural mother." (5 Cal.4th at p. 92.) A mother-child relationship *may* be established by proof of having given birth to the child, *or* by another provision of the Uniform Parentage Act. (§ 7610.) Susan clearly established a mother-child relationship by the undisputed fact that she gave birth to Daniel.

Denise's attempt to show that she was entitled to assert her own parental status as Daniel's *intended* mother must fail. The concept of "intended

mother" is employed only as a tie-breaker when two women have equal claims by "genetic consanguinity" and childbirth. (*Johnson v. Calvert, supra,* 5 Cal.4th at pp. 92-93.) Thus, in *Johnson v. Calvert,* the Supreme Court explained that where Anna Johnson had agreed to bear the genetic child of the plaintiffs, both Johnson (the surrogate) and Crispina Calvert (the genetic mother) had equal claims. Because the child would not have existed but for the surrogacy agreement, the tie was broken in favor of Calvert, the intended mother under the contract. There is no tie here, however, because Denise has neither a gestational nor a genetic relationship to Daniel, whereas Susan does.[7]

Nor does *Buzzanca* help Denise establish her claim to maternity. There, as in *Johnson v. Calvert, supra,* 5 Cal.4th 84, a husband and wife had entered into a surrogacy arrangement that resulted in the birth of a child. Neither the husband nor the wife was genetically related to the child. In the ensuing dissolution action, the husband claimed there were no children of the marriage, while the wife petitioned to be declared the child's mother. The Fourth District, Division Three, found error in the trial court's assumption that legal motherhood could be established only by giving birth or contributing the egg. The husband and wife were the lawful parents because they had consented to a medical procedure that was intended to result in the birth of a child.

It is not necessary to discuss the *Buzzanca* court's comparison of a surrogacy contract to a husband's consent to artificial insemination of his wife. We need only observe that the case before us is completely distinguishable. Susan did not agree to be a surrogate under a contract with Denise; she has instead asserted an independent, competing claim to the child, and she has in fact been declared Daniel's mother. (See § 7610 [natural mother's relationship to child may be established by proof of her having given birth to the child].) Moreover, neither the surrogate nor the ovum donor in *Buzzanca* was asserting any parental claim to the child. Thus, had the appellate court reached the opposite result, the child would have been left with no mother; indeed, she would have had no father either, since the husband (as well as the husband of the surrogate) was denying any parental relationship.

We decline Denise's implied invitation to extend *Buzzanca* to a situation in which (1) a woman has no genetic or gestational relationship to the child,

---

[7]Moreover, even if we were to invoke the concept of intended mother here, which party would qualify? Both—and neither. Susan intended to be the mother of the child created from an embryo implanted in her uterus that day at the clinic—but not *that* embryo, not one belonging to someone else. Indeed, her intent was to obtain an embryo created entirely from the egg and sperm of anonymous donors. Denise intended to be the mother of the child created from this very embryo—but not at that time, and she did not intend for another woman to bear the child.

(2) she has no status comparable to that of a presumed father under section 7611, subdivision (d), and (3) another woman does assert a legally recognized claim. (Cf. *In re Nicholas H.* (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932] [admittedly biologically unrelated man had standing as presumed father]; *In re Raphael P.* (2002) 97 Cal.App.4th 716, 736 [118 Cal.Rptr.2d 610] [remand necessary to determine biologically unrelated man's presumed father status]; see also *In re Karen C.* (2002) 101 Cal.App.4th 932, 936, 938-940 [124 Cal.Rptr.2d 677] [granting standing to child and remanding under *Nicholas H.* for determination whether sole parental candidate was presumed mother]; *Rubano v. DiCenzo, supra,* 759 A.2d at p. 967 [absent biological tie, "parent-like relationship" may be sufficient for standing as interested party in maternity action].) It is undisputed that Denise had no factual basis on which to claim the status of a presumed mother.

We further reject Denise's comparison of Daniel to a plot of land or the timber growing on it. (*Wetherbee v. Green* (1871) 22 Mich. 311) This is a parentage action, not a replevin proceeding. Denise provides no other basis for either challenging Susan's maternity status or establishing her own.

We must conclude, therefore, that the trial court properly declared Robert to be Daniel's father and Susan to be Daniel's mother under sections 7630 and 7610 respectively. The court's ruling comported with this state's interest "in establishing paternity for all children" (§ 7570), recognized the valid claims of gestational mothers, and adhered to the Supreme Court's determination that there can be only one natural mother under California law.

### Disposition

The judgment is affirmed. The parties shall bear their own costs on appeal.

Rushing, P. J., and Mihara, J., concurred.

The petition of appellant Susan B. for review by the Supreme Court was denied September 10, 2003. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.